UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHERYL D. THOMAS,                      :

     Plaintiff,                       :

     vs,                              :     No. 3:11cv1625(WIG)

MICHAEL J. ASTRUE,                     :
Commissioner of Social Security,
                                    :

     Defendant.
-------------------------------------------------------X


RECOMMENDED RULING ON PENDING MOTIONS

     Plaintiff, Cheryl D. Thomas, has appealed the adverse decision of the Commissioner of

Social Security denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI").  The procedural history of this case is undisputed.  After

an administrative hearing, the Administrative Law Judge Ronald J. Thomas ("ALJ") found that

Plaintiff was capable of performing her past relevant work as a claims examiner and, therefore,

was not disabled, as that term is defined by the Social Security Act, from her alleged onset date

of August 31, 2008, to the date of his decision, April 20, 2011. The ALJ's decision became the

final decision of the Commissioner and subject to review by this Court when the Appeals

Council denied Plaintiff's request for review.  20 C.F.R. §§ 404.981, 416.1481.  Now pending

before the Court are Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. # 15 ]

and Defendant's Motion to Affirm [Doc. # 16].  For the reasons discussed below, the Court finds

that the ALJ's decision is supported by substantial evidence and recommends that it be affirmed.

1

Standard of Review

The standard of review of a Social Security disability determination under 42 U.S.C. § 405(g) is well-settled.  It involves two levels of inquiry.  First, the Court must decide whether the Commissioner applied the correct legal principles in making his determination.  Second, the Court must decide whether the Commissioner's determination is supported by substantial evidence.  *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998);  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  Substantial evidence means "more than a mere scintilla."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  It need not compel the Commissioner's decision; rather it is only that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged.  *Id.; see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must consider the entire record, examining the evidence from both sides.  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

It is not this Court's function to determine *de novo* whether the claimant was disabled nor to substitute its opinion for that of the Commissioner.  Rather the Court must determine whether the Commissioner's decision is supported by substantial evidence in the record as a whole or whether it is based on an erroneous legal standard.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  If the Court finds that substantial evidence supports the Commissioner's decision and that the correct legal standards were applied, that decision must be upheld, even if substantial evidence supporting the plaintiff's position also exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).

Background

Plaintiff was born in 1955.  She has a high school education with one year of post-graduate studies, and is English-speaking.  She worked for nine years as a claims examiner for a health insurance company and then for three years as a sales supervisor for a bridal store.  She last worked on December 10, 2008 (R. 209).

On January 5, 2009, Plaintiff filed applications for DIB and SSI claiming that she had been disabled since August 31, 2008, due to back and left leg pain, high blood pressure, fibromyalgia, and a hiatal hernia (R. 209).  She later reported that in July 2009 she had been diagnosed with torn cartilage in her left knee and severe arthritis and was awaiting surgery (R. 232).  As of  September 2009, she was walking with a cane, and she reported that she could not "stand on her leg as long," that she experienced pain in her fingers when cold, and that she had developed a loss of appetite and shortness of breath (R. 243).

Plaintiff's Testimony

At the hearing before ALJ Thomas on February 16, 2011, Plaintiff testified that she had quit work because of the pain in her leg and back, and because she could no longer perform her job either mentally or physically (R. 34).  She tried babysitting after that but had to quit because of pain (R. 34).  She described the conditions that prevented her from working as pain in her lower back shooting down her leg, pain from a torn meniscus and chipped bone in her left knee, bilateral carpal tunnel syndrome worse in her right hand, and pain in her right knee from an old ACL tear (R. 35-37, 39).  She testified that she can only lift about 5 pounds (R. 37).  She uses a cane to ambulate and has a brace for her leg that she uses around the house (R. 38).  She also has

braces for both wrists (R. 38).  At the time of the hearing, she was taking Tramadol,[1] Flexeril,[2] Tylenol with Codeine, Naproxen,[3] Nortriptyline,[4] Vicodin, and "something for depression" (R. 38, 41).  She had been treating at Yale-New Haven Hospital for her carpal tunnel syndrome.  She had recently received a steroid injection, but it did not relieve the pain and she was to return to discuss surgical options (R. 40, 44).  She testified that she also experienced pain in her neck that radiated into her shoulders and down her arms (R. 44-45).  Her primary care doctor, Dr. Seely, prescribed muscle relaxants for this condition (R. 45).  She also has experienced lower back problems since 1999 but had not received any treatment for her back because she and her doctor had been concentrating more on her knee problems (R. 45).  Her doctor was going to refer her to an orthopedist for her back (R. 45).  She also has high blood pressure and acid reflux but those were somewhat under control with medication (R. 51).

At the time of the hearing she was living with her daughter and grandchildren.[5]  Her room was on the second floor and, because of difficulty with stairs, her daughter brought her food upstairs to her.  She testified that if she used her leg to go downstairs and tried to wash dishes or

---

[1]  Tramadol is a narcotic-like pain reliever, used to treat moderate to severe pain. http://www.drugs.com/tramadol.html.

[2]  Flexeril is a muscle relaxant that works by blocking nerve impulses sent to the brain. http://www.drugs.com/search.php?searchterm=Flexeril.

[3]  Naproxen is a nonsteroidal ani-inflammatory drug (NSAIDs) that reduces hormones that cause inflammation and pain in the body. http://www.drugs.com/search.php?searchterm=naproxen.

[4]  Notriptyline is a tricyclic antidepressant that affects chemicals in the brain that may become unbalanced.  http://www.drugs.com/search.php?searchterm=nortriptyline.

[5]  A disability report indicates that Plaintiff had been evicted from her home because of her income (R. 235).

4

cook, "it'll lay me out the next day.  You know, I have so much pain between that night and that morning" (R. 41).  She said that basically she did not do much of anything other than reading (R. 41-42).  She testified that she could dress herself but it was a "trauma."  She testified, "[b]y the time I get dressed to go anywhere, I feel like I worked all day.  Or ran around the block five times" (R. 39).  She testified that she could tolerate sitting for only 15 minutes (R. 46).  It hurt to get up or bend down (R. 46).  She could stand for only 10 to 15 minutes at a time and could only walk one-half block (R. 46).  She had been using a cane since May 2009 because of her torn meniscus (R. 50).  Her doctor had instructed her to keep her leg raised when sitting (R. 47).  She had difficulty sleeping and often did not fall asleep until 5:00 a.m. because her leg felt like the blood was not circulating, as if she had a rubber band around her ankle (R. 47-48).  As a result, she was tired most of the time (R. 48).  Because of a Vitamin D deficiency, she was put on high doses of Vitamin D, which helped restore her functioning (R. 49).  She was also affected by cold temperatures and rain (R. 48).  She could drive, but did not trust herself to drive alone, although she sometimes drove herself to doctors' appointments (R. 42, 51).  She was unable to do laundry because of the lifting (R. 42).  She was able to go shopping, but someone accompanied her to do the lifting (R. 42).  For two and one-half years, she has had no social activities (R. 43).  She did go stay with her brother when her daughter was away, and she and her sister went to Florida for about three weeks (R. 43).

Plaintiff's Medical Records

Plaintiff's complaints of knee problems are first documented in the medical records from late 2008.  On November 19, 2008, Plaintiff presented to Dr. Monaco at Mt. Carmel Medical Associates with complaints of pain in her left leg and left knee for about two months (R. 293).

5

His notes are practically illegible but it appears that Plaintiff was prescribed medication and advised to follow-up with an orthopedist (R. 293). Notes from Dr. Minotti at Connecticut Orthopaedic Specialists indicate that Plaintiff was seen on December 5th. She reported a long history of back pain and was then experiencing left lower extremity pain radiating from her buttock down the back of her leg into her calf and heel. She also complained of numbness in the bottom of her foot and diffuse knee pain. She was taking Nabumetone[6] for pain. On examination, she exhibited decreased range of motion of the lumbar spine and tenderness of the paraspinal region. Her motor strength was 5/5. She was diffusely tender around the left knee although there was no redness or effusion. An x-ray of the lumbar spine showed mild diffuse degenerative changes. An x-ray of her knee did not show any significant degenerative changes. His assessment was sciatica and knee pain, and he ordered an MRI to rule out any compressive lesions (R. 304).

On December 15, 2008, Plaintiff was seen in follow-up by Dr. Monaco and reported that she was still in pain. She had seen an orthopedist for an MRI of her spine. Dr. Monaco noted an antalgic gait, swelling of her knee and ankle edema. He prescribed Tramadol and Plaintiff was to follow-up with Dr. Minotti (R. 293).

On December 30, 2008, Plaintiff returned to see Dr. Minotti with continued complaints of diffuse left lower extremity symptoms in her left buttock, posterior thigh, posterior and lateral knee and calf. She was complaining of fullness ans well as pain in the central part of her knee, which was worse with weight-bearing. An MRI of the lumbar spine did not show any

---

[6] Nabumetone is a nonsteroidal anti-inflammatory drug (NSAID) that is used to treat pain or inflammation caused by arthritis. http://www.drugs.com/mtm/nabumetone.html.

neuroforaminal encroachment (R. 303).  Dr. Minotti's impression was "leg pain."  He reported

that he was "somewhat at a loss to understand Ms. Thomas' pain."  He recommended stretching

as well as anti-inflammatories. She was to follow-up as needed (R. 303).

On February 17, 2009, Plaintiff went to the Emergency Department at St. Raphael's

Hospital complaining of left knee pain, which she rated as "10" out of 10.  She reported that the

anti-inflammatories were not helping.  On examination, her left knee exhibited moderate

tenderness but no swelling, redness, ecchymosis,[7] or limitation in range of motion.  The clinical

impression was left hip and knee pain and she was given Anaprox[8] for pain (R. 312-15).

On March 12, 2009, Plaintiff again presented at the Emergency Department of St.

Raphael's Hospital with complaints of pain and swelling in her left knee, which started about

four months ago and had been waxing and waning.  She rated her pain level as 8 out of 10 (R.

307-08).  On examination, mild tenderness and swelling were noted in the patella, and a small

joint effusion was present.  Plaintiff exhibited no limitation in range of motion (R. 309).  She was

given Tramadol and an ace bandage was applied to her left knee.  Upon discharge, she rated her

pain as a "5" (R. 308).

On March 16, 2009, Dr. Monaco saw Plaintiff in follow-up.  She was still complaining of

left knee pain, difficulty walking and standing or sitting for too long.  Her left foot was tingling,

and she had lower back pain (R. 494).  Dr. Monaco then provided a Physician's Certification of

---

[7]  Ecchymosis is a small hemorrhagic spot in the skin or mucous membrane, forming a
non-elevated, rounded or irregular blue or purplish patch, as a result of trauma to the underlying
blood vessels or fragility of the vessel walls.
http://medical-dictionary.thefreedictionary.com/ecchymosis.

[8]  Anaprox, or Naproxen, is an NSAID used to treat pain or inflammation.
http://www.drugs.com/search.php?searchterm=Anaprox.

Health to the Connecticut Department of Labor, in which he reported that Plaintiff had hypertension, GERD [gastroesophageal reflux disease], and lumbar degenerative disc disease. In his opinion, her job, which required prolonged periods of standing, aggravated her conditions and, therefore, it was necessary for her to leave her position for health reasons. He indicated that Plaintiff was to be evaluated by a specialist to determine if she was able to work (R. 305).

Two days later Plaintiff was seen at Fair Haven Community Health Center by Dr. Seely for complaints of leg, back, and left knee pain. Additionally, her left heel was numb, her toes tingly, and she could not bend her knee. The records note that she had torn her ACL in her right knee (date not indicated) and that it had resolved with therapy (R. 340). On examination, Dr. Seely observed that her left knee was slightly swollen. She was to continue Tramadol and NSAIDs as needed (R. 339).

Plaintiff saw Dr. Monaco again on April 15, 2009 for her left knee pain (R. 494).

On April 22, 2009, she was seen in follow-up by Dr. Seely and reported continuing pain in both legs and in her lower back. Her pain pills were helping, but the pain had worsened. She related that every joint in her body ached from her shoulders down her legs. Her right knee was now starting to feel like her left knee (R. 338). On examination, her left knee was swollen and exhibited tenderness to palpation in scattered areas. A questionable effusion was noted, but range of motion was within normal limits. She was to continue her current medications and engage in limited activity as tolerated (R. 337).

Plaintiff was seen by Dr. Marks at St. Raphael's Hospital on May 12, 2009. She gave a history of chronic back pain and sciatica. She presented with acute knee pain that she said had been present for the past 1 ½ years. Her gait was antalgic and she was unable to walk without the

help of a cane or walker.  On examination, Dr. Marks noted significant pain with sitting and with

back pain radiating down her lower legs bilaterally.  Straight-leg raising was positive, more on

the left than the right.  On palpation, Plaintiff exhibited left knee pain and swelling (R. 412).  An

x-ray of Plaintiff's left knee showed no fracture or evidence of significant degenerative arthritis,

although mild spurring was noted, as well as a possible small joint effusion (R. 350).  His

diagnosis was "chronic left knee sciatic referring back pain associated with chronic knee pain"

(R. 412).  Dr. Marks advised Plaintiff to take anti-inflammatories and pain medication prescribed

by Dr. Minotti and to return with copies of all of her previous imaging reports (R. 412-13).  An

MRI was then performed on her left knee and revealed a large joint effusion and a questionable

loose body in the medial anterior joint space.  Fraying and irregularities of the cartilage were

noted, as well as cartilage defects in the weight-bearing portion of the medial and lateral

meniscus.  The medial meniscus showed a vertical tear, an associated parameniscal cyst, but no

tear of the lateral meniscus (R. 354-55).

The next notes from Dr. Seely at Fair Haven are dated June 15, 2009, when Plaintiff was

complaining of pain in both knees and in her back.  Her left knee was less swollen.  She reported

experiencing lower back pain if she sat too long.  She was taking her medications and "managing

OK" (R. 334).

At the end of June, Plaintiff was seen by Dr. Axtmayer at St. Raphael's.  She reported an

improvement in her knee swelling, although she still had difficulty moving the joint, but her low

back pain was worse.  With sitting, she had significant pain in her back, which radiated down

both legs.  Straight-leg raises were positive bilaterally.  The left knee had a visible effusion,

although Plaintiff reported it was less than at her last visit.  She exhibited tenderness to palpation

over the lumbar and cervical spine and knee joint. She complained of pain radiating down her left arm. Dr. Axtmayer reviewed the December 2008 MRI of her lumbar spine which was unremarkable for any degenerative joint disease, although it did show mild facet arthritis at L3, no disc bulging, and no foraminal stenosis. The MRI of her knee showed a potential medial meniscus tear, a questionable foreign body, and degenerative joint disease. He injected her knee with a steroid to reduce the inflammation and prescribed physical therapy to loosen her muscles so that he could better examine her and determine the cause of her pain. He also ordered x-rays of her hips to determine if there was any degenerative joint disease and an arthritis panel. She was to continue taking Naprosyn, which had quieted down her knee inflammation significantly (R. 348-49). X-rays of the hips demonstrated mild osteophytosis[9] and degenerative changes in the pubic symphysis[10] (R. 353).

In July 2009, Plaintiff began physical therapy. On initial evaluation, Plaintiff reported chronic low back pain, left knee pain, aching in her left lower back and left thigh, and numbness in her left foot with sitting. Her reported pain levels were 9 out of 10 in her back and 10 out of 10 in her knee. She exhibited decreased range of motion in her back (R. 456). After just six sessions, she was discharged due to poor response to treatment (R. 455).

In August, Plaintiff returned to Fair Haven, where she was seen by Dr. Seely for pain in her left knee, body aches and face discoloration. She reported that she had seen an orthopedist, who told her she would need a total knee replacement and had given her a cortisone shot in her

---

[9] Osteophytes are bone spurs, or a bony growth or cartilage protrusion, that form in a degenerating joint. http://www.spinaldisorders.com/osteophytes.htm.

[10] The pubic symphysis is the midline cartilaginous joint that holds the right and left halves of the front part of the pelvis together. http://en.wikipedia.org/wiki/Pubic_symphysis.

left knee, which helped for a few days.  She had also had some physical therapy but no further treatment was planned.  She was using a knee sleeve to help stabilize her left knee (R. 330).

Later that month, Plaintiff was seen by Dr. Mayor at St. Raphael's for a consultation concerning her multiple joint symptoms.  On examination, she was in mild distress.  Her main complaint was her left knee, which exhibited diffuse tenderness, making the examination difficult.  Dr. Mayor noted that she would be seeing a rheumatologist for her multiple joint pains.  Her specific medial left knee pain correlated to her left medical meniscus tear, and he thought she would benefit from an arthroscopic debridement of the meniscus tear (R. 344).

In September, Dr. Seely completed an RFC Questionnaire.  He reported that he had seen Plaintiff monthly since March for right knee pain,[11] arthritis, and questionable lupus, for which she had been referred to Dermatology and Rheumatology.  He rated her prognosis as fair and noted the orthopedist had recommended surgery.  He described her symptoms as left knee and low back and hip pain and fatigue.  He noted that she appeared uncomfortable when bearing weight on her right knee.  He opined that her pain and other symptoms would frequently be severe enough to interfere with her attention and concentration, if she was not taking her pain medications. He indicated that she could tolerate low stress jobs.  She could only walk about one-half city block without rest or severe pain.  She could sit for 2 hours at one time, stand for 10 minutes, stand/walk for a total of less than 2 hours in an 8-hour workday, and sit for a total of

_____

[11] It is not clear whether Dr. Seely intended to refer to Plaintiff's left knee.  He describes her symptoms, *inter alia*, as left knee pain, but later states that she was uncomfortable weight-bearing on her right knee.  Plaintiff maintains that, at this point, she was not treating with Dr. Seely for left knee pain (Pl.'s Mem. at 31).  Rather, she was seeing him only for complaints of right knee pain.  His treatment records, however, indicate that he saw Plaintiff on June 15, 2009 (R. 334) and August 21, 2009 (R. 330) for complaints of pain in her left knee.

about 4 hours in an 8-hour workday.  She would need to include periods of walking every 20 minutes during an 8-hour workday and would need to walk for 5 minutes.  She would need to take 1 to 2 unscheduled breaks a day.  He also indicated that she would need to elevate her legs. She needed to use a cane at times.  She could frequently lift less than 10 pounds and could only occasionally lift 10 pounds.  She should never stoop or crouch.  It was likely that her condition would produce good days and bad days, and that she would probably be out of work at least 4 times a month (R. 361-64).

In November, Dr. Monaco wrote a letter "To Whom It May Concern," indicating that the orthopedists, Dr. Sumner and Dr. Minotti, had handled most of Plaintiff's care for her back and knee pain, and he did not feel qualified to adequately complete an RFC form (R. 389).

Early in January 2010, Plaintiff went to the Emergency Department at St. Raphael's with complaints of left knee pain for the past four months after sustaining a twisting injury, and chronic right hand and wrist ache (R. 392-93).  Her pain was not relieved with pain medication so she came to the ED for evaluation.  On examination, mild localized swelling of the knee was noted, as well as a small joint effusion, but no tingling or numbness (R. 394).  She was ambulatory but limping in the ED (R. 394).  The treating doctor's impression was myalgias, left knee internal derangement, knee joint instability, and possible chronic rheumatoid arthritis (R. 394).  Plaintiff was prescribed Darvocet and discharged that day in stable condition, with a reported pain level of 5 out of 10 (R. 395).

In February, Plaintiff was referred to the Yale Rheumatology Clinic for evaluation of her diffuse body aches, pain, fatigue, and left knee swelling.  The attending doctor noted that she ambulated with extreme difficulty and was using a cane.  She had difficulty standing still due to

pain in her left knee and had an antalgic position.  The doctor attempted to aspirate some synovial fluid from her knee to check for inflammatory arthritis, but was unable to do so (R. 557-58).  The doctor concluded there was no evidence to suggest an underlying inflammatory disease, although she did have significant swelling of the left knee (R. 555).  She later reviewed Plaintiff's MRI, which she reported was consistent with a torn meniscus (R. 555).  The following month, Plaintiff's knee had improved slightly with reduced swelling, but Plaintiff still reported significant pain.  She was still walking with a limp and using a cane, which had aggravated her right knee.  On examination, the doctor noted excruciating pain in her left knee to even light touch.  Having found no evidence of an underlying inflammatory condition, she recommended that Plaintiff return to her orthopedist to see if there were surgical options available to her.  "Her functional status is quite limited as a result of her knee pain" (R. 556).  She also recommended nerve conduction studies for her finger pain.  The fact that her pain was limited to a few fingers, in the doctor's opinion, supported a likelihood of carpal tunnel.  She recommended that Plaintiff wear a wrist splint at night (R. 556).

In April 2010, Plaintiff was given a prescription for a series of three Synvisc injections (R. 465), which were performed at St. Raphael's Hospital in May (R. 467-69).  In April, she also returned to see Dr. Monaco for her knee pain.  He noted that she had been to the Ortho Clinic and Fair Haven Clinic for her knee pain and to the rheumatology clinic at Yale.  He indicated "? for surgery or not" (R. 494).

Plaintiff returned to the Orthopedic Clinic at St. Raphael's in April and again in May for her left knee pain (481, 483-84).  Dr. Scanlan and Dr. McCallum told Plaintiff there was very little evidence that arthroscopic surgery with a medial meniscectomy would be beneficial in the

setting of degenerative joint disease and a meniscal tear. Both noted that she had been attending physical therapy "since she is quite debilitated since her last visit" (R. 481). She brought her Synvisc for injection. Steroid and Marcaine injections in the past only provided relief for two days (R. 481). Both doctors reported that Plaintiff was very difficult to examine because of the pain. She cringed each time they tried to touch her left knee. Dr. McCallum administered the first injection, which she tolerated well and she was to return in one week (R. 481). The second and third injections were administered at two subsequent visits (R. 478, 479).

In July, Plaintiff returned to the Orthopedic Clinic at St. Raphael's for a follow-up visit after her Synvisc injections (R. 476). She reported that they had helped significantly. She had decreased pain but still a general amount of decreased comfort in the left knee and some discomfort in the right knee as well. Dr. Mayor noted crepitus in the left knee and mild crepitus in the right. He gave her a prescription for therapy for twice a week for 6 weeks for quadriceps and hamstring strengthening. His plan was to continue the physical therapy if it helped. If it did not, then surgical intervention would probably be the next step (R. 476).

In September, Plaintiff returned to St. Raphael's where she was seen by Dr. Minotti seeking a new prescription for physical therapy. She had been out of town and her prescription had expired. She also had complaints about her right knee, which were minor in comparison to the left, bilateral hand symptoms, for which she was going to see a plastic surgeon at Yale, and some low back pain, which Dr. Minotti thought sounded axial with radiation into the buttocks and which was minor compared to the knee pain. She was given another prescription for physical therapy (R. 475).

In September, Plaintiff returned to the Yale Rheumatology Clinic. She reported that the

Synvisc injections had helped somewhat with her left knee pain, and her range of motion had improved, but that she was now having right knee pain.  She related that she would soon be starting physical therapy.  As for her wrist pain, Dr. Evans reported that the EMG study showed some mild evidence of sensory neuropathy bilaterally without motor involvement.  Plaintiff was using wrist splints but complained that they were not working and that her grip strength was getting worse.  She was still on a Vitamin-D repletion therapy that had helped her energy levels, although she was still not back to baseline.  She admitted that, as she felt better, she was trying to do more but had run into frustration with overexertion.  Plaintiff reported occasional shortness of breath with exertion, which had also improved with the Vitamin-D supplementation (R. 551).  On examination, her knees showed no swelling or effusions.  Plaintiff reported that they were diffusely tender, although there was no point tenderness during the examination.  Dr. Evans' assessment was that physical therapy was the best treatment for her knee pain.  She also suggested that she should see a hand surgeon to determine if she would benefit from carpal tunnel release surgery, or she could wait until her Vitamin-D levels were back to normal since (R. 552).

It appears that Plaintiff attended six physical therapy sessions over a three-week period (R. 441).  At her initial evaluation, Plaintiff reported that she was having stabbing pain, 8 at worst, 6 at best, and stiffness of the left knee, as well as right knee pain (R. 454).  She was walking with a cane and stood with more weight on her right leg.  Her strength was 4/5 bilaterally.  She had no tingling or numbness and her reflexes were normal.  Plaintiff reported that she could not walk more than one-half block, that she had difficulty going up and down stairs, that she could not sit for more than 20 minutes, and that she had difficulty with cold

15

weather.  The therapist noted swelling in her left knee, decreased range of motion and decreased strength.  Plaintiff's prognosis was fair to good (R. 454).  On September 28, 2010, Plaintiff reported that she did not feel like her left knee was giving out as it had in the past, but she still felt tight behind her calf and knee (R. 444).  Apparently Plaintiff was able to drive to her therapy for there are several notes of her having to leave to get the car to her daughter for work (R. 444, 446).

In October, Plaintiff was seen at Fair Haven Clinic to be cleared for upcoming surgery for a mole on her foot.  She was prescribed Nexium, which she reported worked better than Dexilant.  Dr. Seely's assessment was "hypertension - nearly at goal, no change; skin lesions - for surgery soon; knee pain - managed per ortho; decreased vitamin D, CKD (chronic kidney disease), and mild anemia" (R. 436).

In November, Plaintiff was given another prescription for repeat Synvisc injections to her left knee, which had helped her greatly (R. 474).  These were performed in December 2010 (R. 470-71, 474).

An encounter note from Fair Haven Clinic dated December 17, 2010, from Dr. Seely indicates that a mole had been removed from Plaintiff's foot and was not cancerous (R. 438).  Dr. Seely further reported that her hypertension was almost at goal; she was going to be receiving another series of Synvisc injections for her knee pain and he was considering switching her medications; she was still taking vitamin D supplements; he would be following her laboratory results regarding her CKD and indicated she should try to minimize the Naprosyn; her depression had improved; she would be having surgery for her carpal tunnel syndrome; and she was to follow up with a dermatologist regarding her skin lesions, which he suspected were benign (R.

439).

In January 2011, Plaintiff was seen by Dr. Seth Dodds and Dr. Anthony Ndu at the Hand Clinic at Yale for evaluation of her carpal tunnel syndrome.  Dr. Ndu confirmed the diagnosis of carpal tunnel syndrome after performing certain tests and gave her an injection of Celestone and lidocaine (R. 548).  She was to follow-up in a month to see if the injection worked.  Dr. Ndu explained that the normal course of treatment would be to try wrist braces, which she had already done, have an injection, and then consider a surgical release if the injection did not help (R. 549).

In March, Plaintiff returned to the orthopedic clinic at St. Raphael's complaining of pain in her left and right knees.  She reported that her knee pain, which she rated as 7 out of 10, had not changed since the last Synvisc injection in January.  She was limited in her ability to walk, climb stairs and go from sitting to standing.  Her right knee was now bothering her as well.  Dr. Gibson noted that she had undergone a course of physical therapy to no avail.  On examination, she exhibited full range of motion of the left knee and mild pain to palpation of the knee joint (R. 560).  New x-rays of the left knee revealed increased arthritic changes from 2009.  "Patient's joint has very much deteriorated since that time and the patellofemoral joint is also compromised.  Overall arthritic changes were seen diffusely throughout the joint" (R. 560).  An x-ray of the right knee revealed minimal loss of medial joint space (R. 562).  She was to continue using a cane and to follow up with her primary care doctor (R. 560).

On May 18, 2011, Dr. Seely wrote "To Whom It May Concern,"

I have been caring for Ms. Thomas since . . . 3/18/2009.  She has been plagued with a number of significant issues, most notably hand pain with EMG changes believed due to carpal tunnel syndrome along with significant knee pain and structural pathology for which there is a plan for her to have surgery.

17

> Ms. Thomas is not able to work at this time, but I am hopeful that she will be able to return to work in at least a limited capacity if her issues can be accurately diagnosed and treated.

(R. 272).

In June, he completed another Physical Medical Source Statement.  He reported that she had "<u>constant</u> knee pain and wrist/hand pain, requiring narcotics, worse with activity" (R. 564) (emphasis in original).  He described the clinical findings and objective signs as neuropathy, proven by EMG.  He also noted that she suffered from depression.  He reported that she could walk less than a block without rest or severe pain; she could sit for only 1 hour at a time before needing to get up; she could stand only 20 minutes at one time; she could stand/walk less than 2 hours total in an 8-hour workday but she could sit for a total of 6 hours in an 8-hour workday; she would need to walk every 90 minutes, for 5 minutes at a time; and she would require one unscheduled break per week for five minutes (R. 565).  Contrary to his earlier opinion, he indicated that her legs did not need to be elevated with prolonged sitting  (R. 566).  He opined that she could frequently lift less than 10 pounds and occasionally lift 10 pounds.  She should never twist, stoop, crouch, or climb ladders, but she could rarely climb stairs.  He now reported significant limitations with the use of her fingers and hands and stated that she should only use her hands and fingers about 20% of the workday and use her arms for reaching in front and overhead only 50% of the day (R. 566).  He opined that she would be "off task" approximately 25% of the time or more.  She was capable of low stress work.  He thought she would be out of work approximately 3 days per month.  Finally, he stated that her impairments were reasonably consistent with the symptoms and functional limitations described in his evaluation (R. 567).

DDS RFC Assessments

18

On August 3, 2009, Dr. Virginia H. Rittner completed an RFC Assessment for DDS based upon her review of the medical records.  She opined that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday.  She should never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, and occasionally kneel, crouch, and crawl (R. 63).  She further noted that Plaintiff's complaints of pain were out of proportion to the degree of degenerative change seen on x-ray (R. 64).  She opined that Plaintiff could perform her past relevant work as a claims examiner (R. 65).

Dr. Arthur Waldman performed a second RFC Assessment for DDS in December 2009.  His assessment was almost the same as Dr. Rittner's (R. 82-83).  He, too, found that Plaintiff should be able to perform her past relevant work (R. 84).

### The ALJ's Decision

Following the five-step sequential evaluation process required by the regulations,[12] 20 C.F.R. §§ 404.1520, 416.920, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since December 10, 2008 (R. 16).  Next, he found that she had the following severe impairments: arthritis of the knees and carpal tunnel syndrome (R. 16).  He determined that her alleged depression was not a severe impairment because the record revealed little, if any, functional limitations due to a mental impairment (R. 17).  At the next step, he held that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the

---

[12]  Additionally, for purposes of DIB, the ALJ determined that Plaintiff met the insured status requirement through December 31, 2012 (R. 15).

Listings").  The ALJ then determined that Plaintiff had the RFC to perform a full range of sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), but was limited to occasional bending, stooping, twisting, squatting, kneeling, crawling, climbing, and balancing, and must work in an environment free from poor ventilation, dust, gases, odors, humidity, wetness, and temperature extremes (R. 18).  Given his RFC determination, the ALJ found that Plaintiff was capable of performing her past relevant work as a claims examiner (R. 21).  Accordingly, he held that she had not been under a disability from August 31, 2008, to the date of his decision, April 20, 2011 (R. 21).

Discussion

In her appeal, Plaintiff raises four principal arguments supporting reversal of the ALJ's decision: (1) that the ALJ's findings with respect to Plaintiff's credibility and claims of pain are fatally flawed and unsupported; (2) the ALJ failed to follow the "treating physician rule"; (3) the ALJ's vocational analysis is unsupported; and (4) the ALJ failed to perform a proper "combination of impairments" analysis.  The Court will consider these issues in the order that they would have arisen in the sequential evaluation process followed by the ALJ.

(1) Combination of Impairments

As Plaintiff argues, it is well-settled that the ALJ must consider all of a claimant's impairments individually and in combination throughout the disability process, even if an impairment, when considered separately, would not be of sufficient severity to serve as the basis for eligibility for disability benefits under the law.  *See* 20 C.F.R. §§ 404.1523, 416.923 (requiring the ALJ to consider the combined effect of all of a claimant's impairments throughout the disability evaluation process); Social Security Ruling 85-28, 1985 WL 56856, at *3 (S.SA.

1985); *see Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995). Plaintiff does not specify which impairments were not considered by the ALJ. She simply alleges in conclusory fashion that the ALJ failed to consider the combined effect of all claimed impairments. *See* Pl.'s Mem. at 36-37. Here, the ALJ acknowledged his duty to consider all of Plaintiff's impairments, both severe and non-severe (R. 14), as well as "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (R. 15, 18). In addition to the two impairments that the ALJ found to be severe, arthritis of the knees and carpal tunnel syndrome, the ALJ also considered Plaintiff's back pain, diffuse joint pain, and shortness of breath (R. 16-21). Ultimately, the ALJ assessed an RFC that included both exertional and non-exertional limitations based upon the combination of all of Plaintiff's impairments. The Court finds no error in this regard. *See Tinsley v. Barnhart*, No. 3:01cv977, 2005 WL 1413233, at *6 (D. Conn. June 16, 2005) (rejecting the plaintiff's conclusory argument that the ALJ failed to properly consider the combined effects of all of her impairments).

(2) <u>ALJ's Credibility Determination and Assessment of Plaintiff's Pain</u>

Plaintiff next argues that the ALJ's findings with respect to her credibility and claims of pain are fatally flawed and unsupported by the record.

Social Security Ruling 96-7p provides in relevant part:

Whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

21

Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. 1996). "The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  "In so doing, the ALJ must set forth his reasons for discounting plaintiff's subjective complaints with "sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence." *Miller v. Barnhart*, No. 02 Civ. 2777, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003); *see* 20 C.F.R. §§ 404.1529(c), 416.929(c).  If the ALJ's decision to ignore the plaintiff's subjective complaints of pain is supported by substantial evidence, then this Court must uphold that determination.  *Miller*, 2003 WL 749374, at *7 (citing *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Moreover, the ALJ's failure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are "sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination." *Delk v. Astrue*, No. 07-CV-167, 2009 WL 656319, at *4 (W.D.N.Y. Mar. 11, 2009).

Plaintiff contended that she was totally disabled and unable to work due to the combination of exertional and non-exertional limitations.  She claimed that she was limited to lifting 5 pounds, she required a cane to ambulate, she could only sit for 15 minutes, she could only stand for 10 to 15 minutes, and she could only walk half a block.  She also reported that she needed to elevate her legs during the day and that she became short of breath on exertion.

The ALJ found that Plaintiff was affected by some level of physical pain in her knees, back, and hands, which limited her ability to lift heavy objects and to ambulate effectively (R.

22

20).  Thus, he limited her to sedentary work[13] with additional postural limitations (R. 20).  He

also included environmental restrictions in light of her testimony concerning her shortness of

breath, although the etiology of this condition was unclear (R. 21).  Lastly, he did not include

manipulative restrictions given the treatment planned for her carpal tunnel syndrome because he

found insufficient evidence that Plaintiff would be restricted from manipulative work for more

than 12 months (R. 12).  To the extent that Plaintiff's statements concerning the intensity,

persistence, and limiting effects of her symptoms were inconsistent with this RFC assessment,

the ALJ found them not credible (R. 18).

　　　In making this determination, the ALJ reviewed the seven factors listed in 20 C.F.R. §§

404.1529(c), 416.929(c) for assessing credibility and specifically discussed those that applied to

Plaintiff's case.  With respect to her activities of daily living, 20 C.F.R. §§ 404.1529(c)(3)(i),

416.929(c)(3)(i), the ALJ found that Plaintiff's testimony concerning her extremely limited

activities was not supported by the relatively mild objective findings on diagnostic studies and

her ability to travel, noting that she had traveled to Florida with her sister and, on another

occasion, she left town and her physical therapy prescription expired (R. 19).  As for the location,

---

[13]  The regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time
> and occasionally lifting or carrying articles like docket files,
> ledgers, and small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties.  Jobs are
> sedentary if walking and standing are required occasionally and
> other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

23

duration, frequency, and intensity of her pain, and treatment Plaintiff was receiving, 20 C.F.R. §§ 404.1529(c)(3)(ii) & (v), 416.929(c)(3)(ii) & (v), the ALJ observed that the medical records reflected that Plaintiff's left knee pain improved with medication, the findings on diagnostic studies had been relatively mild, including an upper extremity EMG revealing only mild carpal tunnel syndrome, a pulmonary function test that was normal, and an MRI of the left knee showing only a meniscal tear (R. 19).  He found these diagnostic test results to be indicative of some degree of functional limitation but inconsistent with the extreme level of impairment alleged by Plaintiff (R. 19).  He further noted that her right knee was being treated conservatively, based on the improvement of her left knee with injections (R. 19).  He found this course of treatment to be consistent with the RFC he assigned and inconsistent with Plaintiff's allegations of a complete inability to work (R. 19).  The ALJ further noted that Plaintiff's course of treatment for her carpal tunnel syndrome was inconsistent with her claims of disabling symptoms that precluded the use of her hands for work activities (R. 20).

As for opinion evidence, the ALJ found that Dr. Monaco's opinion that Plaintiff should not engage in prolonged standing was consistent with his RFC assessment (R. 20).  As for Dr. Seely's responses to an RFC Questionnaire, the ALJ gave it little weight because of the internal inconsistencies (referring to the left and right knees)[14] and the lack of objective clinical findings, although he noted that the restrictions assigned by Dr. Seely were generally consistent with his RFC determination (R. 20).  He gave some weight to the opinions of the DDS non-examining doctors, although his RFC assessment was more restrictive than theirs (R. 20).

---

[14]  *See* Note 11, *supra*.

Initially, the Court finds that the ALJ's discussion adequately satisfied the requirements of Social Security Ruling 96-7p that the ALJ set forth the reasons for his decision with sufficient particularity to permit the Court to conclude that he considered the entire record and to permit a meaningful review of his credibility assessment. *See* Social Security Ruling 96-7p, 1996 WL 374186, at *2 (S.S.A. 1996). *Delk*, 2009 WL 656319, at *4. Additionally, the Court finds substantial evidence to support the ALJ's credibility assessment.

As the ALJ observed, contrary to Plaintiff's allegations that she largely spends her days in bed and does not do much of anything other than read (R. 41-42), Plaintiff was able to travel by plane to Florida for three weeks (R. 43), and appears to have taken a second trip that caused her to miss her physical therapy (R. 475-76). Despite her complaints of disabling pain, Plaintiff was able to drive and shop, although frequently accompanied by someone else to do the lifting (R. 42, 51), and according to her Activities of Daily Living Questionnaire, completed in 2009, she was able to cook complete meals, although she could not stand on her feet too long, and she was able to clean the house, although it took her longer than before (R. 219-20). She was able to go shopping for an hour (R. 221). Medical records refer to her over-exerting herself (R. 551) or avoiding "overuse" (R. 339), which suggests a level of activity far greater than alleged by Plaintiff.

Plaintiff claimed to have lower back problems since 1999 (R. 45), which she characterized in her request for reconsideration as "severe deg[enerative] disc disease" in her back (R. 107, 117), yet she told the ALJ that she had not received any treatment for her back because she and her doctor were concentrating more on her knee (R. 45). She complained of disabling back and knee pain, yet the medical records indicate that pain pills were helping (R.

338), that she was "managing OK" (R. 334), that the Naprosyn had quieted down her knee inflammation significantly (R. 348-49), and that the Synvisc injections had helped significantly (R. 476).  In general, with respect to her knee pain, her doctors recommended conservative treatment, such as stretching and physical therapy (*e.g.*, R. 552).

Likewise, with respect to her carpal tunnel syndrome, as the ALJ noted, Plaintiff was treated in a stepwise fashion, first with wrist braces, then an injection, and if the injection did not work, surgical options would be considered (R. 548-49).  The record does not indicate whether Plaintiff actually had surgery or the results of that surgery.[15]  The ALJ reasonably concluded that this "stepwise" approach to treatment belied Plaintiff's allegations of disabling symptoms that precluded the use of her hands due to carpal tunnel syndrome for a period of 12 months or more (R. 20, 37-39).  Moreover, Plaintiff's ability to drive contradicts her alleged level of pain, as does her ability to sew and cook, which she reported in 2009 (R. 221).

The ALJ also considered the minimal objective findings on diagnostic studies.  In December 2008, an MRI of Plaintiff's spine did not show any foraminal encroachment and an x-ray revealed only mild diffuse degenerative changes.  An x-ray of Plaintiff's left knee did not show any significant degenerative changes (R. 303).  Dr. Axtmayer also reviewed the December 2008 MRI of the lumbar spine and reported that it was unremarkable for any degenerative joint disease, although it did show mild facet arthritis at L3, no disc bulging, and no foraminal stenosis

---

[15]  Dr. Seely does indicate in his May 18, 2011, letter that there was a "plan" for Plaintiff to have surgery and he hoped that she would be able to return to work in at least a limited capacity if her issues could be accurately diagnosed and treated (R. 272).  Even with the additional records that were provided to the Decision Review Board (R. 4), it is unclear whether Plaintiff ever had surgery or the results of that surgery.

(R. 348-49).  X-rays of the left knee in 2009 showed no fracture, no evidence of significant

degenerative arthritis, and only mild spurring and a possible small joint effusion (R. 318),

although an MRI showed a large joint effusion, with the suggestion of a 3 mm. loose body in the

medial anterior joint space, a medial meniscus tear, and fraying and irregularity of the cartilage

including a 4 mm. defect involving the weight-bearing portion (R. 320-21).  Nevertheless, only

conservative treatment was recommended.  X-rays taken in 2011 revealed increased arthritic

changes in the left knee from 2009 but minimal loss of medial joint space in the right knee (R.

560, 562), and her left knee continued to exhibit full range of motion (R. 560).

The DDS reviewing physicians noted that although the "imaging in file identifies some

degenerative changes of the lumbar spine and knee," Plaintiff's complaints were "out of

proportion" to those changes (R. 83, 92).  Both DDS reviewing physicians determined that

Plaintiff was capable of performing her past work as a claims examiner (R. 65, 84).  Moreover,

even Plaintiff's doctors were "somewhat at a loss to understand [her] pain" (R. 303).

Thus, in light of Plaintiff's activities of daily living, her treatment history, the objective

medical evidence, the reports from the DDS physicians as well as Plaintiff's own doctor, the

Court finds substantial evidence in the record to support the ALJ's assessment of Plaintiff's

credibility.  As the Second Circuit has repeatedly held, "[i]t is the function of the

[Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the

credibility of witnesses, including the claimant."  *Stanton v. Astrue*, 370 Fed. Appx. 231, 234 (2d

Cir. 2010) (quoting *Aponte*, 728 F.2d at 591) (alterations in original). "We have no reason to

second-guess the credibility finding . . . where the ALJ identified specific record-based reasons

for his ruling."  *Id.* (citing SSR 96-7p).  Similarly, in this case, where the ALJ has identified

27

numerous reasons for his credibility finding, which are supported by substantial evidence in the reocrd, the Court will not second-guess his decision.

(3)  The "Treating Physician Rule"

Next, Plaintiff invokes what is commonly referred to as the "treating physician rule" or "treating source rule," and argues that the ALJ erred in his evaluation of the opinion of Dr. Seely. Under the "treating source rule," a treating source's opinion on the issues of the nature and severity of a claimant's impairments is given "controlling weight" if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record.  20 C.F.R. §§ 404.1527, 416.927; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  The opinion of a treating source is accorded extra weight because of the continuity of the treatment that he or she provides, and the doctor-patient relationship places him or her in a unique position to make a complete and accurate diagnosis of the patient.  *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983). However, the opinion of a treating source will not be afforded controlling weight if that opinion is not consistent with other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino,* 312 F.3d at 588; 20 C.F.R. §§  404.1527, 416.927.

An ALJ who refuses to give controlling weight to the medical opinion of a treating source must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. §§  404.1527(c)(2), 416.927(c)(2).  Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the

treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id.; Halloran*, 362 F.3d at 33. The regulations also require the ALJ to "give good reasons" for the weight he affords to a treating source's opinion. 20 C.F.R. §§ 404.1527, 416.927; *see also Schaal,* 134 F.3d at 503-04.

Initially, the Court addresses Plaintiff's argument that the ALJ erred in not considering Dr. Seely's June 3, 2011 medical source statement. The answer is quite simple. The ALJ's decision was rendered on April 20, 2011, more than 6 weeks before Dr. Seely provided this second opinion. The ALJ did not have this opinion to consider.[16]

With respect to Dr. Seely's first statement dated September 23, 2009, Plaintiff criticizes the "limited weight" assigned by the ALJ. The ALJ stated that he was affording "limited weight" to the opinion of Dr. Seely because he found it unsupported by objective clinical findings as well as his own treatment notes, and because it contained internal inconsistencies referencing the right knee at times and the left knee at others (R. 20). However, he did find that the restrictions imposed by Dr. Seely were generally consistent with his own restrictions (R. 20).

As noted above,[17] there were, in fact, inconsistencies in Dr. Seely's September 2009 report. Dr. Seely's report (R. 361-63) referred to a diagnosis of <u>right</u> knee pain and arthritis and "? lupus" (R. 361, Question No. 2), yet he indicated her pain was located in the <u>left</u> knee, lower back (R. 361, Question No. 5), and he identified the only clinical findings and objective signs as

---

[16]   The report was before the Appeals Council, which considered it (R. 1), but found that it did not provide a basis for changing the ALJ's decision (R. 2).

[17]   *See* Note 11, *supra*.

"Pt. appears uncomfortable when bearing weight on R [right] knee" (R. 361, Question No. 7) (emphasis added). He described no treatment or response to treatment that would have implications for working. He deferred to the specialists as to whether Plaintiff's impairments would last 12 months (R. 361). Nevertheless, he ascribed very significant functional limitations to Plaintiff's left knee and low back impairments.

Significantly, at this point in time, Dr. Seely's treatment of her knee and back problems had been fairly limited. He was her primary care doctor and saw her for the first time on March 18, 2009, just six months prior, when she presented with complaints of leg, back, and knee pain and "feeling funny" on her toes (R. 361, 339). On examination, her left knee was "*slightly swollen*" but not warm or erythematous and exhibited full range of motion on extension (r. 339)(emphasis added). He continued her Tramadol and NSAIDs as needed, and cautioned her to "*avoid overuse*, especially when on painkillers" (R. 339)(emphasis added). On April 22, 2009, Plaintiff was seen in follow-up by Dr. Seely with complaints of left and right leg pain and lower back pain. She reported that her pain medications were working but the pain was worsening. Her left knee felt better when she was off of it; her right knee was starting to feel like her left. Her left heel was still numb and her toes tingly. She was taking Tramadol and Naproxen, about four per day (R. 338). On examination, her left knee was swollen and was tender to palpation in scattered areas; a questionable effusion was noted, but her range of motion was normal. Her back exhibited *slight tenderness* to palpation over the S1 joints bilaterally (R. 337)(emphasis added). Plaintiff was to continue with her current medications and engage in limited activity as tolerated (R. 337). On June 15, Dr. Seely's nurse noted that Plaintiff presented with "*episodic left knee pain for a couple of months, getting worse*" (R. 334)(emphasis added). Dr. Seely's notes

indicate that Plaintiff reported pain in both knees and back; she was taking her medications and "*managing OK.*"  Her left knee was *less swollen* and she reported low back pain if she sat too long (R. 334)(emphasis added).  Dr. Seely noted that PT [physical therapy] had helped in the past (R. 334).  On examination, Dr. Seely observed that she appeared uncomfortable and got up frequently to walk around.  He noted a *trace* of lower extremity edema bilaterally and a decreased range of motion at S1.  Plaintiff was to continue her medications for her knee and back pain (R. 333)(emphasis added).  On August 12, 2009, when Plaintiff next saw Dr. Seely, she was wearing a knee sleeve to help stabilize her left knee, she reported that she had some physical therapy but no further treatment was planned; "taught patient how to sit."  She related that she had received a cortisone shot that helped for several days, and that the orthopedist told her she would need a total knee replacement (R. 330).  Dr. Seely's assessment/plan indicates "knee pain - ortho following. May need L TKR [left total knee replacement]" (R. 329).

Based on this six-month treatment of Plaintiff for her knee and back problems and his limited observations of slight swelling in her knee and a trace of bilateral edema, her reports that she was "managing OK" on pain medications, subsequent reports of less knee swelling but back pain if she sat too long, Dr. Seely opined, *inter alia*, in September that Plaintiff could only sit for 2 hours, stand for 10 minutes, stand/walk for a total of less than 2 hours in an 8-hour workday, and sit for about 4 hours in an 8-hour workday (R. 363).  Although he had only treated her four times over the course of six months, he was of the opinion that she would be absent from work more than 4 times each month because of her impairments or treatment, yet he indicated there were no implications for working caused by her treatment and medications (R. 361, 363).  He did not think she would need a job which permitted shifting positions at will from sitting to standing

or walking, but he did think she would need to take 1 to 2 unscheduled breaks per day (R. 363). Even though there is absolutely no reference in Dr. Seely's treatment records that Plaintiff should elevate her legs - to the contrary, he encouraged her to "avoid overuse," "to engage in limited activity as tolerated" -  he reported that she would have to elevate her legs to horizontal 50% of the time (R. 363).  Notably, this limitation was not reported in his 2011 Physical Medical Source Statement (R. 566).  The Court concurs with the ALJ that Dr. Seely's treatment notes do not support the degree of functional limitation set forth in his responses to the Physical RFC Questionnaire.

Given the inconsistencies in Dr. Seely's report, the lack of support in his medical records for his opinions, the Court finds no error in the "limited weight" afforded this opinion by the ALJ, and concludes that the ALJ provided good reasons for the weight he afforded this opinion. *See Halloran*, 362 F.3d at 32; *Veino*, 312 F.3d at 588.

(4) The ALJ's Vocational Analysis

Last, Plaintiff's challenges the ALJ's determination at step four of the sequential evaluation process that she retained the RFC to perform her past relevant work as a claims examiner.  Plaintiff does not dispute that this work meets the definition of "past relevant work,"[18] (Pl.'s Mem. at 34), but contends that the ALJ should have referred to the *Dictionary of Occupational Titles* ("DOT") for a definition of the requirements of trhis job as it is ordinarily performed throughout the national economy and then performed a function-by-function

_____

[18] "Past relevant work" is work that the claimant has performed within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it.  20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1).  Here, Plaintiff worked as a claims examiner for Blue Cross Blue Shield for nine years, from 1996 to 2005 (R. 210, 268).

comparison of the job with Plaintiff's specific impairments.  Plaintiff also challenges the ALJ's

failure to call a vocational expert to testify at the hearing.

Initially, the Court notes that it was Plaintiff's burden to prove that she was unable to

perform her past relevant work.  *See Bush v. Shalala*, 94 F.3d 40, 45 (2d Cir. 1996); *Smith v.*

*Barnhart*, 406 F. Supp. 2d 209, 213 (D. Conn. 2005).  The regulations provide that an ALJ "*may*

use the services of vocational experts . . . or other resources, such as the 'Dictionary of

Occupational Titles' . . . to obtain evidence . . . to help [the ALJ] determine whether [the

lcaimant] can do [his or her] past relevant work, given [his or her] residual functional capacity."

20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) (emphasis added).  Thus, use of the *Dictionary of*

*Occupational Titles* ("DOT") is not required by the regulations.

Additionally, the ALJ may consider whether the claimant is capable of performing his or

her past relevant work as the claimant actually performed it or as it is generally performed in the

national economy.  *See* Social Security Ruling 82-61, 1982 WL 31387 (S.S.A. 1982) (setting

forth three possible tests for determining whether a claimant retains the capacity to perform his or

her past relevant work: (1) whether the claimant retains the capacity to perform a past relevant

job based upon a broad generic, occupational classification of the job, *e.g.,* "delivery job,"

"packaging job," etc.; (2) whether a claimant retains the capacity to perform the particular

functional demands and job duties peculiar to an individual job as he or she actually performed

it; and (3) whether a claimant retains the capacity to perform the functional demands and job

duties of the job as ordinarily required by employers throughout the country, in which event the

ALJ may rely on the DOT descriptions to define the job as it is usually performed); *Wagner v.*

*Astrue*, 499 F.3d 842, 853 (8th Cir. 2007); *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir.

2001); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).  In this case, the ALJ relied on Plaintiff's description of her work as a claims examiner as she actually performed the job in the past.  She described her work as "paid claims for health insurance; Processed an[d] examined claims on Data Base; Billing and coding" (R. 268).  As for what she did all day, she responded "processed claims, medical insurance, phone contact, typing, dealing with customers" (R. 210).  In her job, she was required to walk 1 hour; stand 1 hour; sit 7 hours; stoop .5 hours; crouch .5 hours; write, type or handle small objects 7 hours (R. 210).  The heaviest weight lifted was 10 pounds; the weight frequently lifted was less than 10 pounds (R. 210).  Based upon Plaintiff's own description of her work as a claims examiner, the ALJ appropriately determined that she had the RFC to perform her past relevant work.  He was not required to use the DOT descriptions. *See* Social Security Ruling 82-16.  The Court finds that the ALJ's determination was supported by substantial evidence.

Because the ALJ found at step four of the sequential evaluation process that Plaintiff could perform her past relevant work , he was not required to obtain the testimony of a vocational expert.  *Stanton*, 370 Fed. Appx. at 235; *see* 20 C.F.R. §§  404.1560(b)(3), 416.960(b)(3) (a claimant found to have the RFC to perform his or her past relevant work will be found "not disabled"); *see also Hernandez v. Comm'r of Social Sec.*, 433 Fed. Appx. 821, 823 (11th Cir. 2011) (holding that generally vocational expert testimony is not necessary to determine whether a claimant can perform his past relevant work).

## Conclusion

For the reasons discussed above, the Court finds no legal error in the ALJ's decision and

finds his determination supported by substantial evidence.  Accordingly, the Court recommends that the final decision of the Commissioner be affirmed.  Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. # 15 ] should be DENIED, and Defendant's Motion to Affirm [Doc. # 16] should be GRANTED.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2).

In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part.  *See* Fed. R. Civ. P. 72(b)(3) and D. Conn. Local  Rule 72.1(C)(1) for Magistrate Judges.

SO ORDERED, this ___2nd___ day of May, 2013, at Bridgeport, Connecticut.


    /s/ *William I. Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge

35